NEBRASKA NUTRIENTS, INC., A NEBRASKA CORPORATION, ET AL.,
APPELLANTS, V. WYMAN SHEPHERD AND LEO CORBET, APPELLEES.
NEBRASKA NUTRIENTS, INC., A NEBRASKA CORPORATION,
APPELLEE, RAYMOND CLAYTON ROLES, INDIVIDUALLY,
APPELLANT, AND TRI-STATE CONSTRUCTION & SUPPLY, INC.,
A NEBRASKA CORPORATION, APPELLEE, V. WYMAN SHEPHERD
AND LEO CORBET, APPELLEES.

626 N.W. 2d 472

Filed May 11, 2001.    Nos. S-95-624, S-98-782.

724

Todd R. McWha and Terrance O. Waite, of Waite & McWha, and John E. DeWulf, of Roshka, Heyman & DeWulf, P.L.C., for appellants Nebraska Nutrients, Inc., Raymond Clayton Roles, and Tri-State Construction & Supply, Inc.

Thomas E. Johnson, Kirk S. Blecha, and Patrick J. Ickes, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellant Raymond Clayton Roles (case No. S-98-782).

Robert B. Reynolds and R. Kevin O'Donnell, of McGinley, O'Donnell, Reynolds, & Edwards, P.C., and Robert W. Mullin and Maren Lynn Chaloupka, of The Van Steenberg Firm, for appellee Wyman Shepherd.

Richard A. Dudden, of Padley & Dudden, P.C., and G. Gregory Eagleburger, of The Eagleburger Law Group, for appellee Leo Corbet.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

In 1990, Arizona residents Raymond Clayton Roles, Wyman Shepherd, and Leo Corbet formed two Nebraska corporations known as Nebraska Nutrients, Inc. (Nebraska Nutrients), and Tri-State Construction & Supply, Inc. (Tri-State), for the purpose of building and operating a plant near Sutherland, Nebraska, to manufacture ethanol and yeast products. In 1993, when the plant was approximately 95 percent complete but not yet operational, Roles and Nebraska Nutrients filed this action for declaratory judgment and injunctive relief in the district court for Lincoln County, which action was later amended to include Tri-State, seeking a determination that Roles was the sole officer, director, and shareholder of the two corporations and had full authority to negotiate a sale of the plant. In separate answers, Shepherd and Corbet each asserted an ownership interest in the corporations and the plant by virtue of a written agreement dated November 1, 1990, and counterclaimed against Roles for damages based upon an alleged breach of the agreement. Following a bifurcated trial in which the court sitting without a jury found in favor of Shepherd and Corbet on the claims for declaratory judgment and injunctive relief and a jury returned verdicts in their favor on the counterclaims, the district court entered judgments in favor of Shepherd and Corbet in the amounts of $6,649,141 and $5,571,945, respectively. Thereafter, the district court overruled Roles' motion for a new trial or judgment notwithstanding the verdict and awarded attorney fees and expenses to Shepherd and Corbet as a judgment against Roles. Roles perfected this timely appeal.

# I. BACKGROUND

## 1. FACTUAL BACKGROUND

Corbet, a former state senator and gubernatorial candidate in Arizona, has been licensed by that state as an attorney and real estate broker. In November 1989, he arranged a luncheon meeting in Phoenix, Arizona, for the purpose of introducing Roles and Shepherd, with whom he had been acquainted for several years. In arranging the meeting, Corbet hoped to broker the sale of a ranch owned by Shepherd to Roles.

Roles is a successful developer of more than 100 mobile home parks and recreational vehicle resorts in Arizona. He became acquainted with Corbet through their mutual involvement in Arizona politics. Shepherd's background is more diverse. After receiving his high school diploma through the general educational development program, Shepherd began his career by building self-serve gas stations in five states. Although he is not a licensed engineer, he subsequently built a small oil refinery in Louisiana. According to Shepherd, this company was worth approximately $25 million by 1981, when changes in crude oil laws affected his profits. In response to such changes, Shepherd converted the refinery into an ethanol plant, using blackstrap molasses imported from Brazil as the energy source. After some initial financial difficulties, including a bankruptcy filing, Shepherd's molasses-based ethanol plant was operational for several years. Following the enactment in 1986 of new legislation requiring the exclusive use of Louisiana products in the manufacture of ethanol in that state, Shepherd converted his plant to corn-based production of ethanol at a cost of approximately $20 million. The converted plant operated successfully for 3 months until Louisiana completely abolished its ethanol subsidy program, at which time Shepherd again filed bankruptcy. This bankruptcy proceeding was pending when Shepherd became involved with the Sutherland plant.

Although the real estate sale envisioned by Corbet when he introduced Roles to Shepherd never came to fruition, the three men entered into discussions of other investment opportunities and eventually decided to build and operate a plant to manufacture ethanol and yeast products. After making preliminary

inquiries, they decided to build the plant on a site near Sutherland, Nebraska. They chose to pursue this venture in Nebraska because the then Nebraska Ethanol Authority and Development Board (Ethanol Authority), a state agency created to promote the building of ethanol plants in Nebraska, had funds available for investment in ventures manufacturing ethanol from corn. In addition, the men were aware of proposed legislation in Nebraska subsidizing ethanol production.

The three men originally planned to build the Sutherland plant with incremental construction funding provided by the Ethanol Authority. In furtherance of this plan, they caused a preliminary application for investment funds to be submitted to the Ethanol Authority on March 15, 1990. This document was submitted on behalf of "International Nutrient, Inc.," an Arizona corporation, and signed by Shepherd as its president. The preliminary application proposed a plant which could produce approximately 6 million gallons of ethanol per year, as well as torula yeast, corn gluten feed, and corn oil. The projected total investment was $9.5 million. The Ethanol Authority approved the preliminary application on April 13, 1990. On the following day, the Governor of Nebraska signed new legislation which created a 20-cents-per-gallon producer incentive for ethanol production in the state.

On July 17, 1990, Nebraska Nutrients submitted a formal application, which pertained to the proposed Sutherland plant, to the Ethanol Authority. The application identified Roles as "Owner, Director, CEO"; Shepherd as "President, Director, Chief Operating Officer"; and Corbet as "Marketing Manager, Director Public Affairs." The application included biographical information pertaining to each of the three individuals. It proposed a 14-million-gallon ethanol plant, larger than that described in the preliminary application due to the passage of the aforementioned legislation granting producers of ethanol a 20-cents-per-gallon credit. The application stated that the plant would involve an investment of $11.5 million, to be raised by the purchase of 5,865,000 shares of common stock at $1 par value by Roles and the purchase of 5,635,000 shares of preferred stock at $1 par value by the Ethanol Authority. The total anticipated cost of the plant subsequently increased to $12.5 million when Roles,

Shepherd, and Corbet determined that it would be necessary to construct a wastewater treatment facility at the Sutherland site.

The formal application submitted to the Ethanol Authority included pro forma financial and product yield projections for the plant. The pro forma projections indicated that the plant would produce ethanol, germ, corn gluten feed, gluten, torula yeast, and brewers' yeast. The projections for each product were prepared by Shepherd and his accountant, Richard Dodd, although Shepherd alone determined how much of each product the plant was capable of producing and the expected price of each product. Shepherd arrived at the projected prices for brewers' yeast, gluten, germ, and corn gluten in discussions with George Wright of Coors Bio-Tech, Inc., a subsidiary of the Adolph Coors Brewing Company. Shepherd determined the projected price for torula yeast by examining the value placed on such yeast by the U.S. Commerce Department on imports and by inquiring of a former marketer of torula yeast. He kept no records of his inquiries or the results thereof.

Shepherd also provided the data used in determining the anticipated operational costs for the plant. In doing so, he projected how much corn, natural gas, electricity, and other chemicals the plant would require and the cost thereof. Shepherd used his experience acquired at his Louisiana corn dry mill plant to estimate the cost of the foregoing items, as well as payroll, startup, and administrative expenses. He admitted that the Louisiana plant was a dry mill plant and so the product yields were different than the proposed wet mill. A dry mill plant breaks up the entire corn kernel in a grinding process. A wet mill, on the other hand, soaks or steeps the kernel so that the kernel can be easily divided into its component parts. Shepherd also admitted that the Louisiana plant operated as a corn mill for a period of only 90 days, which he noted was "probably not" a fair period of experience to judge the costs of production.

A report from R & R Resources of Golden, Colorado, was also included in the formal application. The report analyzed the expected product yields at each stage of the proposed corn processing operation at the plant and noted that the estimated yields were predicated on general corn wet mill yields. The report further noted that the yield projections might be slightly off

because of the plant's unique design (discussed below) but found that the extra products produced by the plant would make up for any discrepancy in the yield numbers. Similarly, Shepherd testified that the yield numbers were based upon a typical corn wet mill and that the extra products produced by the plant would make up for other losses.

Following submission of the formal application, the Ethanol Authority assembled a team to perform a due diligence review of the formal application submitted by Nebraska Nutrients. The review team consisted of Steve Sorum, an employee of the Ethanol Authority who was designated as the project manager, and five members of the Ethanol Authority's board of directors. The team was assisted by a law firm to review legal issues, an accounting firm to review the financial information contained in the application, an engineering firm to perform a technical review of the plant's design and process, and a consulting firm which was to perform an assessment of the proposed marketing of products to be manufactured by the plant. In a memorandum to the review team dated July 19, 1990, Sorum stated: "The initial task for the review team is to determine if this project merits funding. If so, we shall negotiate an agreement with the applicants and present the entire package to the full EADB for a vote to approve the investment."

On August 7, 1990, Roles, Shepherd, and Corbet formed Nebraska Nutrients, and on September 6, the three formed Tri-State. Tri-State was formed to actually build the plant which Nebraska Nutrients would eventually own in order to avoid possible liability problems associated with the construction. A formal groundbreaking ceremony was held at the plant site on September 21, although some preliminary work had been done prior to that date.

Although plans and preparations for the Sutherland plant had been continuing for nearly a year, a final agreement as to their respective roles in the venture was not signed by Roles, Shepherd, and Corbet until November 1, 1990. The agreement was drafted by Corbet and provided:

> 1. ROLES shall advance, as a loan to the venture, a mutually agreed upon sum of money and shall lend his business experience to the venture.

2. ROLES shall employ SHEPHERD and CORBET to act as consultants. SHEPHERD shall lend his expertise and ability to build and manage the plant. CORBET shall devote his time and efforts to obtain a favorable climate for financing the facility and to market the finished product.

3. All stock . . . shall be issued as follows:

One-third (1/3[)] to RAY ROLES

Further, the remaining stock shall be issued and shall be indentured as follows:

One-third (1/3) to WYMAN SHEPHERD

One-third (1/3) to LEO CORBET.

4. Stock issued (1/3 to SHEPHERD and 1/3 to CORBET) cannot be pledged or otherwise used in any manner by the said SHEPHERD and CORBET until such time as ROLES has been completely paid or until, in his sole discretion, he agrees to release said shares.

5. ROLES shall receive eighty-five percent (85%) of the net profits until such time as he has been repaid all sums advanced by him; at such time as he has been repaid all such sums, ROLES shall then revert to fifty percent (50%) of the net profits until such time as he has received twice his original investment.

6. SHEPHERD shall initially receive ten percent (10%) of the net profit of the venture.

7. CORBET shall initially receive five percent (5%) of the net profits of the venture.

. . . .

9. After such time as ROLES has been repaid his original investment, SHEPHERD and CORBET shall each receive twenty-five percent (25%) of the net profits.

10. At such time as ROLES has received double his original investment, ROLES, SHEPHERD and CORBET shall each be an equal partner and entitled to their shares of stock in one-third (1/3) ownership without further encumbrance from ROLES.

Meanwhile, in approximately September 1990, the Ethanol Authority's review team became concerned about Shepherd's prior bankruptcies and the "short steep" process that was to be used at the plant. In a normal corn wet mill, corn is "steeped" or

soaked for 24 to 48 hours in order to separate the component parts of the kernel to produce ethanol. The proposed Sutherland plant utilized wet mill technology, but also included a short steep process that was designed to reduce the amount of steeping time to under 8 hours, thereby dramatically increasing the pace of production while reducing costs. It is undisputed that this short steep process has never been used on a commercial basis anywhere in the world. Because the Ethanol Authority would not invest in the project until the short steep process was proved, a pilot plant was constructed and the short steep process was tested on or about November 5, 1990. Both Roles and Shepherd testified that visual observation indicated that the process worked, although later laboratory test results were inconclusive. Shepherd testified that after viewing the results of the pilot plant test, Roles said he was satisfied that the process would work and told Shepherd to continue with the project without further testing. Roles denied making such statements. No laboratory results of the pilot test were ever provided to the Ethanol Authority.

On November 8, 1990, Roles, Shepherd, and Corbet met with members of the review team to further discuss the details of the Ethanol Authority's proposed investment in the plant. At that time, the three were informed that the Ethanol Authority had additional concerns about investing in the project due to newspaper reports of a political scandal in Arizona involving Corbet. Thereafter, on December 4, 1990, Roles met with Sorum and another member of the review team. At that time, Roles was informed that the review team would recommend that the Ethanol Authority not invest in the project due to concerns about the plant's short steep design and Corbet's political troubles. To alleviate these concerns, Roles proposed funding the plant himself if the Ethanol Authority would commit to an investment after the plant was completed and fully operational. Roles intended to borrow money on the commitment of the Ethanol Authority and then repay the lender with the proceeds of the Ethanol Authority's investment after the plant was completed.

On December 5, 1990, Roles met with Shepherd and Corbet and informed them that the Ethanol Authority would not invest as originally planned. At that time, Roles informed Shepherd

and Corbet that he had agreed to fund the plant construction himself if the Ethanol Authority would commit to providing funds once the plant was built. According to Corbet, Roles assured him at that time that they would remain partners. All three men agreed to proceed on these terms.

On January 4, 1991, the Ethanol Authority's review team issued preliminary findings summarizing the due diligence process it had undertaken to determine whether the Ethanol Authority should fund the Nebraska Nutrients project as proposed. Noting that the plant would employ "a truncated version of the standard wet milling process used by many of the world's corn refiners" which was "unproven at pilot and commercial scales," the evaluation team stated that it had negotiated a proposed agreement whereby the Ethanol Authority would not invest any funds until the plant had reached 75 percent of anticipated production levels and an independent engineer certified that it was "capable of producing the quantity and quality of products" projected by Nebraska Nutrients. The review team noted that "the markets for torula yeast, gluten feed and germ can be penetrated with relatively low risk" and that while the market for brewers' yeast "will be more difficult," the proposed agreement between Nebraska Nutrients and Coors Bio-Tech "would effectively give [Nebraska Nutrients] an immediate entry into established markets and access to an established sales force with no direct costs." Referring to studies conducted by an accounting firm at the request of the review team, the team found that "[t]he cashflow analysis, based on [Nebraska Nutrients'] assumptions and projections shows the project can generate sufficient cashflow to provide the required return of the [Ethanol Authority's] investment. It is also clear that the project will provide jobs and a market for grain." The preliminary findings concluded that while the review was not yet completed, the review team members were "very positive" about the proposal and would probably recommend that the Ethanol Authority participate in the project.

Such a recommendation was, in fact, made on January 11, 1991. In its "Final Report and Recommendation" of that date, the review team noted that subsequent to the submission of the preliminary application, "[t]he proposed plant had been restructured

and re-designed to produce 14 million gallons of ethanol annually along with 12.5 thousand tons of corn germ, 53.5 thousand tons of corn gluten and corn gluten feed and 7.9 thousand tons of yeast products." The report noted that the Ethanol Authority had been asked to invest $6.125 million of the total projected cost of $12.5 million. The report further noted that because of concerns regarding the unproved short steep process to be utilized in the plant, this investment would not be triggered until construction had been completed and the plant had met certain "quantity and quality criteria" and thus demonstrated "it's [sic] technical viability." After discussing various strengths and weaknesses associated with the proposal, the report concluded:

> We, of course, cannot anticipate or mitigate all risks involved with a project of this magnitude. Operational problems after the first year of production are potential risks. The ethanol market price fluctuates with volatile crude oil prices and that represents significant risks and there are surely others. However, the Evaluation Team feels that the due diligence review, the work of the consultants and staff, and the resulting Agreements address, to a great extent, the major risks involved with this project.

> As a result, the Evaluation team finds that the applicant has demonstrated that a "reasonable possibility" exists that the [Ethanol Authority] will recoup it's [sic] investment. The Evaluation Team and the Project Manager recommend the [Ethanol Authority] make an investment of $6.125 million in this project subject to terms of the Agreement.

At Shepherd's suggestion, Roles had engaged an attorney to negotiate the agreement with the Ethanol Authority. On or about February 22, 1991, an "Agreement for Purchase of Limited Partnership Interest" was entered into by the Ethanol Authority, Nebraska Nutrients, and Nebraska Nutrients, Ltd., a Nebraska limited partnership formed on the same date. The agreement provided that the Ethanol Authority, as limited partner, would invest $6.125 million when certain conditions precedent were met. One of these conditions was that the plant be certified by an independent engineer as meeting technical specifications appended to the agreement which included operation at 75 percent capacity for 72 hours. Another condition was the submission of

[w]ritten evidence satisfactory to the Authority that [Nebraska Nutrients] has made an equity investment in the Partnership as purchase price for its general partner's interest therein, to be used by the Partnership for capital purposes, in the amount of at least Six Million Three Hundred Seventy-five Thousand Dollars ($6,375,000) in cash, actual acquisition cost of property (increased at [Nebraska Nutrients'] option by an amount equal to the overhead and profit that could otherwise be paid to Tri-State Construction & Supply, Inc., as specified in Section 5.02(a) hereof, up to the fair market value of such property), or other allowable capital costs (as defined in [Neb. Rev. Stat.] § 66-1303(3) [(Reissue 1990)] of the [Ethanol Development] Act[, now codified at Neb. Rev. Stat. § 66-1333 (Reissue 1996)]), and that the allowable capital costs for the Project total at least Twelve Million Five Hundred Thousand Dollars ($12,500,000); provided, that if the allowable capital costs for the Project total less than the amount specified, the Authority's investment in the Units shall be reduced proportionately so that the Authority's investment in the Units totals not more than forty-nine percent (49%) of allowable capital costs[.]

The agreement with the Ethanol Authority further provided that Roles was the sole holder of stock in Nebraska Nutrients and that there were "no rights, warrants, or options for any other person or entity to purchase any stock or securities of [Nebraska Nutrients]." Also, the agreement permitted the Ethanol Authority to terminate its obligation to invest in the project if all conditions were not met and closing had not occurred by September 30, 1991. A "Joinder by Tri-State Construction & Supply, Inc.," signed on the same day by Roles, purported to join Tri-State with the rights and obligations of Nebraska Nutrients set forth in the agreement.

On February 25, 1991, Shepherd and Corbet signed separate but identical documents entitled "Agreement and Mutual Representation." These documents, which we refer to as "the disclaimers," purported to disclaim any interest in Nebraska Nutrients and terminate any agreement in existence granting any interest in that corporation, although they were silent as to Tri-

State. Shepherd testified that he did not discuss his disclaimer with Roles prior to the date it was signed. On that date, however, Shepherd had a telephone conversation with Roles in which Roles stated that he needed the disclaimer signed for the Ethanol Authority so Roles could obtain financing and that Shepherd had to sign so that Corbet would also sign. According to Shepherd, Roles told him that signing the disclaimer would not change the November 1, 1990, agreement of the parties. Roles denied making this statement and testified that at some point in time, he told Shepherd that he would continue in the project and would later share in an employee incentive plan. Corbet testified that he was told by Roles that the Ethanol Authority required the disclaimer and that things between them would remain the same. Roles denied making the statement and testified that he told Corbet he was no longer an owner at the time the disclaimer was signed. On cross-examination, Roles admitted that the Ethanol Authority never told him the disclaimers were required, but he maintained that they were necessary by the terms of the agreement with the Ethanol Authority which provided that he was the sole shareholder in Nebraska Nutrients. He further admitted that if he told Corbet the disclaimer was required by the Ethanol Authority, such statement was untrue and that he would have known at the time that the statement was untrue. Both Shepherd and Corbet testified that they knew that the agreement which Roles had reached with the Ethanol Authority required that Roles be the sole shareholder of Nebraska Nutrients.

After February 25, 1991, Shepherd continued to oversee construction of the project, working at the jobsite 6 or 7 days a week, 10 to 12 hours per day. Although Roles insisted that Shepherd stayed on only as a consultant and did not have a compensation agreement after February 25, Shepherd testified that Roles treated and referred to him as a co-owner both before and after that date. Other witnesses testified they heard Roles refer to Shepherd as an owner or partner after February 25, although there was also some testimony to the contrary. When seeking financing for the project just before and also after February 25, Roles represented to potential lenders that all three men were owners of the project.

Corbet continued his lobbying efforts and his efforts to secure financing after February 25, 1991. The evidence reveals that he contacted numerous persons and entities regarding financing after February 25, although he was unable to locate a lender for the project. In May or June 1991, Roles became angry with Corbet's lack of success in securing financing and precluded Corbet from involvement in the plant, ordering that he no longer be furnished with information. Shepherd admitted that he and Roles had agreed at about this time to terminate Corbet's interest and divide it among themselves, but further testified that he understood that Roles intended to compensate Corbet for his interest.

Beginning in late 1992, Roles moved to Nebraska and worked at the jobsite during the week, returning to Arizona on the weekends. Due to various construction delays, the Ethanol Authority had extended the contractual deadline for completion of the plant several times, with the final deadline established as June 30, 1993. Roles testified that by May 1993, he had lost faith in Shepherd and that he decided to discontinue funding for the project and to order the work stopped. At that point, Roles testified that he had invested approximately $13.6 million in the project. The Ethanol Authority did not fund any portion of the project because the plant was not completed by the contractual deadline. On July 7, 1993, Roles initiated a special meeting of Nebraska Nutrients "to fire Shepherd and eject him from the Project's business premises."

Additional facts will be set forth in our discussion and disposition of specific assignments of error.

## 2. PROCEDURAL BACKGROUND

Roles and Nebraska Nutrients initiated this action by filing a pleading designated "Petition for Declaratory Judgment" on July 15, 1993. The petition alleged the existence of the November 1, 1990, agreement between Roles, Shepherd, and Corbet and execution of the disclaimers by Shepherd and Corbet on February 25, 1991. Roles and Nebraska Nutrients alleged that despite executing the disclaimers, Shepherd and Corbet had demanded an interest in Nebraska Nutrients and held corporate meetings at which corporate stock was issued to them. Roles and Nebraska Nutrients further alleged, on information and

belief, that Shepherd and Corbet "intend[ed] to repudiate the [disclaimers] and claim an interest in [Nebraska Nutrients]." Roles and Nebraska Nutrients alleged that "[t]he [disclaimers are] enforceable, and therefore Shepherd and Corbet have no legal interest in [Nebraska Nutrients]." Based upon these allegations, Roles and Nebraska Nutrients prayed for declaratory relief that "the [disclaimers are] enforceable; [that] Corbet and Shepherd are bound by [their] terms and conditions; [and t]hat Shepherd and Corbet have no right, stock, title or interest in [Nebraska Nutrients] or any profits it may earn." They also requested relief based upon the claim that "Roles is the sole Officer, Director and Shareholder of [Nebraska Nutrients] and [that] by virtue of this interest, Roles has full power and authority to negotiate on behalf of [Nebraska Nutrients] to sell a part or all of the Project to third parties." Roles and Nebraska Nutrients further sought "an order authorizing Nebraska Nutrients, Inc., to issue all outstanding shares of capital stock to Raymond C. Roles," as well as temporary and permanent injunctive relief to bar Shepherd and Corbet from the project premises and prevent them from taking any action on behalf of Nebraska Nutrients.

. On the same day that the petition was filed, the district court entered a temporary restraining order upon the application of Roles and Nebraska Nutrients which barred Shepherd and Corbet from the Sutherland plant site and prohibited them from holding themselves out as owners or representatives of Nebraska Nutrients or purporting to take any action on its behalf. The court subsequently denied the motion of Shepherd and Corbet to vacate the restraining order but amended it to restrain and enjoin all parties "from transferring, mortgaging, selling or disposing of any of the property of Nebraska Nutrients, Inc." On September 3, 1993, an amended petition was filed which added Tri-State as a party plaintiff.

Shepherd and Corbet filed separate answers and counterclaims in which they admitted the existence of the November 1, 1990, agreement and alleged that it remained in effect and governed the rights of the parties. They alleged that they executed the disclaimers only after Roles represented that they were solely for the purpose of obtaining financing from the Ethanol

Authority and would not affect their interest in the venture as set forth in the November 1 agreement. They asserted various affirmative defenses including fraud, estoppel, and failure of consideration. Both counterclaimed against Roles for damages based upon allegations of breach of contract, breach of fiduciary duty, and fraud.

Roles, Nebraska Nutrients, and Tri-State moved to bifurcate the trial, requesting that issues pertaining to the ownership of the Sutherland plant and their request for injunctive relief be tried separately from the counterclaims. The district court granted the motion and scheduled a bench trial on all equitable issues. This trial was held from January 11 through 19, 1994. On February 4, the district court entered a "Journal Entry and Interlocutory Decision" in which it determined that Roles fraudulently induced Shepherd and Corbet to execute the disclaimers; that the disclaimers were therefore null and void; and that Roles, Shepherd, and Corbet were bound by the November 1, 1990, agreement with respect to their interest in Nebraska Nutrients and Tri-State. This determination was based upon detailed findings of fact set forth in the order. In reaching its findings, the district court noted that "[t]he credibility of the parties is . . . of crucial importance, as the testimony of Roles is diametrically opposed to that of Shepherd and Corbet" and set forth its reasons for resolving the conflicting testimony in favor of Shepherd and Corbet.

On February 11, 1994, Roles, Nebraska Nutrients, and Tri-State moved the district court "for an order withdrawing its interlocutory decision . . . and decide [sic] the same as a final ruling so that an appeal may be taken." The district court denied this motion and dissolved the temporary restraining order which had remained in effect through the time of trial pursuant to the stipulation of the parties. Notwithstanding the denial of their motion and the specific designation of the February 4, 1994, order as interlocutory, Roles and the two corporations filed a notice of appeal on March 4, 1994. This appeal was docketed as case No. A-94-242 and was eventually moved to the docket of this court which, on April 30, 1996, dismissed it as premature because of the absence of a final, appealable order. The mandate was spread upon the record of the district court on May 8, 1996.

On June 2, 1995, while case No. S-94-242 was pending, Roles filed a verified "Motion for Application to Appoint Receiver" in the district court pursuant to Neb. Rev. Stat. § 25-1081 (Reissue 1995). The motion alleged that during the pendency of the appeal, Roles, Shepherd, and Corbet had attempted to sell the Sutherland plant; that Roles had received an offer to purchase a 220-acre tract near the plant which he owned; and that a receiver should be appointed to oversee the sale because "[t]he parties have been unable to voluntarily arrange a sale . . . ." Roles further alleged:

> The equitable powers of this Court should be exercised in order to allow this structure to turn into a functioning ethanol plant despite the differences between the parties, not only for the benefit of the parties, but also to improve the economy in the Sutherland, Nebraska area due to the employment at the ethanol plant, to increase the demand for corn, and to respond to the increasing demand for ethanol products. The parties can then continue their dispute with regard to proceeds from the sale thereof and any remaining issues as part of the appeal.

The motion was signed by the attorneys then representing Roles, Nebraska Nutrients, and Tri-State and verified by Roles in the presence of a notary public.

In an order filed on June 8, 1995, the district court denied the motion on the ground that Roles had " 'unclean hands' " by virtue of his "prior fraudulent conduct," as determined in its 1994 order, and therefore could not invoke the equitable jurisdiction of the court. Roles perfected an appeal from this order which was placed on the docket of this court as case No. S-95-624. On January 17, 1997, case No. S-95-624 was stayed by this court upon receipt of notice that involuntary bankruptcy proceedings involving Nebraska Nutrients had been commenced in the U.S. Bankruptcy Court for the District of Arizona. In response to a status inquiry from our clerk, counsel for Corbet advised on July 16, 1997, that the bankruptcy court had stayed all litigation involving the corporate entities but not any litigation between Roles, Shepherd, or Corbet. On July 5, 2000, Shepherd and Corbet filed a joint motion to dismiss case No. S-95-624 on the ground that the issues presented were moot.

Roles filed an objection to this motion. On September 8, 2000, counsel for Shepherd filed a "Notice of Bankruptcy Closing Pursuant to Rule 11G," attaching a copy of an "Order Approving Final Account, Closing Case and Discharging Trustee" filed in the bankruptcy proceeding on July 22, 2000. The motion to dismiss in case No. S-95-624 was pending at the time the present appeal was submitted, and is currently pending.

Notice of the aforementioned bankruptcy was filed in the district court on August 5, 1996. On the same day, Roles' current counsel entered his appearance. On May 1, 1997, Shepherd filed a "Motion to Set Case Progression," representing that "Plaintiff Raymond C. Roles is not in bankruptcy proceedings and the Bankruptcy Court has ruled that there is no stay with respect to Plaintiff Roles." The action then proceeded with respect to the previously bifurcated counterclaims of Shepherd and Corbet against Roles.

Following a jury trial held from February 6 through 19, 1998, the jury returned verdicts in favor of Shepherd and Corbet and the district court entered judgments thereon in the amount of $6,649,141 in favor of Shepherd and $5,571,945 in favor of Corbet, with postjudgment interest at 6.232 percent. On February 27, Roles moved alternatively for a new trial or judgment notwithstanding the verdict, asserting 50 separate grounds including "irregularity in the jury's conduct and deliberations." After conducting evidentiary hearings on the allegations of juror misconduct, the district court entered a "Memorandum Opinion and Judgment" on June 30, 1998, in which it denied the motion for new trial and judgment notwithstanding the verdict; awarded Shepherd and Corbet attorney fees and expenses totaling $1,395,754.34, plus postjudgment interest at 6.434 percent to be paid by Roles; and approved a supersedeas bond in the amount of $15,387,029.58. Roles perfected this timely appeal.

## II. ASSIGNMENTS OF ERROR

Roles assigns, restated, that the district court erred (1) in conducting the 1998 jury trial while an appeal from the 1994 equity order was pending; (2) in failing to find in the 1998 jury trial that the November 1, 1990, agreement and the purported oral contract to lend money lacked the requisite specificity to consti-

tute enforceable contracts; (3) in allowing into evidence in the 1998 jury trial the financial data prepared by Dodd and Shepherd and the testimony of Michael Raasch and Fred Lockwood as to damages; (4) by instructing on the wrong measure of damages and failing to find the evidence of damages in the 1998 trial insufficient to warrant submission to the jury; (5) in proceeding in the 1998 jury trial on the basis of its finding in the 1994 equity trial that Roles had committed fraud; (6) in giving, in the 1998 trial, a pretrial instruction referring to its findings at the 1994 equity trial, particularly the finding of fraud, in giving instructions Nos. 8 and 17, in refusing Roles' offered instructions Nos. 2 and 3, and in failing to define for the jury the elements of a contract; (7) in overruling Roles' motions for directed verdict, judgment notwithstanding the verdict, and for new trial at the 1998 trial, including the claim of juror misconduct; (8) in awarding attorney fees to Shepherd and Corbet in the 1998 trial; and (9) in failing to find that the jury verdict was clearly erroneous.

## III. ANALYSIS

### 1. JURISDICTION

#### (a) Error Assigned

In his first assignment of error, Roles contends that the district court lacked jurisdiction to conduct the 1998 trial which resulted in money judgments against him because of the pendency of the appeal from the order denying his motion for appointment of a receiver, docketed at case No. S-95-624.

#### (b) Standard of Review

■ When a jurisdictional question does not involve a factual dispute, its determination is a matter of law, which requires an appellate court to reach a conclusion independent of the decisions made by the lower courts. *In re Guardianship of Rebecca B. et al.*, 260 Neb. 922, 621 N.W.2d 289 (2000); *Holste v. Burlington Northern RR. Co.*, 256 Neb. 713, 592 N.W.2d 894 (1999).

#### (c) Resolution

■ It is well-settled law that after an appeal to an appellate court has been perfected in a civil case, a lower court is without

jurisdiction to hear a case involving the same matter between the same parties. *McLaughlin v. Hellbusch*, 251 Neb. 389, 557 N.W.2d 657 (1997). However, a party may appeal from a court's order only if the decision is a final, appealable order. *Airport Auth. of Village of Greeley v. Dugan*, 259 Neb. 860, 612 N.W.2d 913 (2000); *Raney v. Blecha*, 258 Neb. 731, 605 N.W.2d 449 (2000). A notice of appeal from a nonappealable order does not render void for lack of jurisdiction acts of the trial court taken in the interval between the filing of the notice and the dismissal of the appeal by the appellate court. *Holste v. Burlington Northern RR. Co., supra.* Thus, whether the district court had jurisdiction to conduct the 1998 trial in this case depends upon whether its June 8, 1995, order denying Roles' application for appointment of a receiver was a final, appealable order from which the appeal docketed at case No. S-95-624 was properly taken.

The three types of final orders which may be reviewed on appeal are (1) an order which affects a substantial right in an action, when such order in effect determines the action and prevents a judgment; (2) an order affecting a substantial right made during a special proceeding; and (3) an order affecting a substantial right made on summary application in an action after a judgment is rendered. Neb. Rev. Stat. § 25-1902 (Reissue 1995); *Raney v. Blecha, supra.* The order denying Roles' application for appointment of a receiver clearly does not fall within the first or third categories, but Roles argues that the order was one affecting a substantial right and made in a special proceeding. He relies upon *Robertson v. Southwood*, 233 Neb. 685, 693, 447 N.W.2d 616, 621 (1989), in which we held pursuant to Neb. Rev. Stat. § 25-1090 (Reissue 1995) that "[t]he appointment of a receiver may be treated as a final order." This statement was simply a recognition of the fact that § 25-1090 specifically authorizes an appeal from "[a]ll orders appointing receivers, giving them further directions, and disposing of the property . . . ." The statute makes no mention of orders *denying* a request for appointment of a receiver, and *Robertson* is therefore inapposite.

Special proceedings entail civil statutory remedies not encompassed in chapter 25 of the Nebraska Revised Statutes. *In re Estate of Peters*, 259 Neb. 154, 609 N.W.2d 23 (2000). The appointment of a receiver is a provisional remedy governed by

statutes found within chapter 25, article 10, specifically Neb. Rev. Stat. §§ 25-1081 to 25-1092 (Reissue 1995), and thus does not fall within the category of a special proceeding. See *Slaymaker v. Breyer*, 258 Neb. 942, 607 N.W.2d 506 (2000). Regardless of whether a substantial right was affected, the denial of Roles' application for the appointment of a receiver was not made in a special proceeding and cannot be considered a final order under the argument advanced by Roles or on any other basis. The pending motion of Shepherd and Corbet to dismiss case No. S-95-624 will be granted for the reason that there is no appellate jurisdiction.

Because the appeal docketed at case No. S-95-624 was from an order which was not final, the district court retained jurisdiction to conduct the 1998 jury trial. See *Holste v. Burlington Northern RR. Co.*, 256 Neb. 713, 592 N.W.2d 894 (1999). Accordingly, we proceed to the merits of Roles' appeal from the 1998 judgment, docketed as case No. S-98-782.

### 2. FINDING OF FRAUD

#### (a) Error Assigned

In his fifth assignment of error, Roles contends that the district court erred as a matter of law in proceeding with the 1998 jury trial on the basis of its finding, following the 1994 trial, that Roles had fraudulently induced Shepherd and Corbet to sign documents purportedly disavowing any interest in Nebraska Nutrients. Roles argues, inter alia, that the evidence did not support this finding.

#### (b) Standard of Review

The challenged finding of fraudulent inducement was made during the first trial in this bifurcated proceeding. In moving for bifurcation, Roles requested that his claims for relief be tried separately from the counterclaims asserted by Shepherd and Corbet. In order to determine the appropriate standard of review with respect to findings of fact which the district court made in the first phase of the bifurcated trial, we must first determine whether that proceeding was one at law or equity.

In Roles, Nebraska Nutrients, and Tri-State's operative amended petition, they sought a declaratory judgment determin-

ing that Roles was the sole shareholder of Nebraska Nutrients and Tri-State by virtue of the disclaimers executed by Shepherd and Corbet and sought injunctive relief preventing Shepherd and Corbet from acting on behalf of the corporations and barring them from the premises of the Sutherland plant. An action for declaratory judgment is sui generis; whether such action is to be treated as one at law or one in equity is to be determined by the nature of the dispute. *Lone Cedar Ranches v. Jandebeur,* 246 Neb. 769, 523 N.W.2d 364 (1994).

An action for injunction sounds in equity. *Airport Auth. of Village of Greeley v. Dugan,* 259 Neb. 860, 612 N.W.2d 913 (2000); *Central States Found. v. Balka,* 256 Neb. 369, 590 N.W.2d 832 (1999). Shepherd and Corbet sought, in effect, to rescind the disclaimers based upon allegations that they executed them in reliance upon fraudulent representations by Roles. Rescission is equitable in nature. *Cao v. Nguyen,* 258 Neb. 1027, 607 N.W.2d 528 (2000).

In its journal entry and interlocutory decision setting forth its findings following the 1994 trial, the district court noted that its "decision pertains only to the equitable issues of this proceeding which were bifurcated for trial to the Court." We agree that Roles' claims adjudicated in this initial phase of the bifurcated proceeding were equitable in nature. Resolution of these claims required the district court to adjudicate the defenses asserted by Shepherd and Corbet that the purported disclaimers were fraudulently procured by Roles. In an appeal of an equitable action, an appellate court tries factual questions de novo on the record, reaching a conclusion independent of the findings of the trial court. Where credible evidence is in conflict on a material issue of fact, the appellate court will consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Cao v. Nguyen, supra; Dillon Tire, Inc. v. Fifer,* 256 Neb. 147, 589 N.W.2d 137 (1999).

(c) Resolution

A party alleging fraudulent representation as the basis for rescission must prove all elements of fraudulent conduct by clear and convincing evidence. *Cao v. Nguyen, supra; Schuelke*

*v. Wilson*, 255 Neb. 726, 587 N.W.2d 369 (1998). The elements of proof are (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff reasonably did so rely; and (6) that he or she suffered damage as a result. *Cao v. Nguyen, supra; Four R Cattle Co. v. Mullins*, 253 Neb. 133, 570 N.W.2d 813 (1997). Whether a party's reliance upon a misrepresentation was reasonable is a question of fact. *Cao v. Nguyen, supra.* While direct evidence in a fraud case is not essential, proof of fraud drawn from circumstantial evidence must not be guesswork or conjecture; such proof must be rational and logical deductions from the facts and circumstances from which they are inferred. *Four R Cattle Co. v. Mullins, supra.* See *Schuelke v. Wilson, supra.*

At trial, Shepherd and Corbet sought to prove that Roles induced them to sign the disclaimers by representing that the disclaimers were required by the Ethanol Authority as a condition of its financial commitment, but that signing the documents would not affect the November 1, 1990, agreement of the parties with respect to their equal interests in the Sutherland project. Corbet testified that Roles told him on December 5, 1990, that he had proposed to fund the construction of the plant himself in order to secure the Ethanol Authority's commitment to invest in the completed plant and that Roles assured him, " 'Don't worry, we'll still be partners, it will still be the same thing,' or words to that effect." Corbet further testified that he subsequently signed the disclaimer only after Roles assured him in a telephone conversation that " '[t]he authority requires it,' " and " '[y]ou don't have to worry, everything between us is still going to be the same.' " Shepherd testified that Roles told him that the disclaimer was required by the Ethanol Authority and that Corbet would not sign it unless Shepherd did. Shepherd testified that in the same conversation, Roles told him not to worry about their agreement because nothing would change. Two representatives of the Ethanol Authority who were personally involved in the negotiations which led to the Ethanol Authority's commitment to invest in the plant when it was completed testified that they

had never seen the disclaimers signed by Shepherd and Corbet or the November 1 agreement executed by Roles, Shepherd, and Corbet prior to the time of their testimony at the 1994 trial.

Testifying at the 1994 trial, Roles denied telling Corbet that the disclaimers were required by the Ethanol Authority. Roles was impeached with testimony from a pretrial deposition in which he admitted telling Corbet that the disclaimer was required by the Ethanol Authority. Roles then conceded that if he had made such statements, they would have been known by him to be untrue at the time.

After executing the disclaimers, Shepherd and Corbet continued their involvement in the project and performed their respective functions described in the November 1, 1990, agreement. Shepherd continued working full time without a salary, supervising construction at the Sutherland plant until June 1993, when Roles terminated funding for the project. Roles admitted that he needed Shepherd's continued involvement in order to protect his investment in the plant. With Roles' knowledge and approval, Shepherd signed documents in his capacity as president of Nebraska Nutrients both before and after executing the disclaimer. Roles, Shepherd, and several nonparty witnesses testified that during the period between November 1990 and May 1993, Roles publicly referred to Shepherd as his "partner" and as one of the "owners of the project" and took no exception when Shepherd was referred to by the media as an "owner."

After signing the disclaimer, Corbet continued his lobbying and marketing efforts on behalf of the project and assisted Roles in seeking additional financing for the project. At some point between February 25 and May 3, 1991, Roles and Corbet met with a potential financier at a restaurant in Scottsdale, Arizona. Prior to the meeting, Corbet sent the financier a packet of information about the project which he had previously sent to Roles for his review. The documents identified Roles, Shepherd, and Corbet as the eventual owners of Nebraska Nutrients. During the meeting, and in Roles' presence, Corbet stated that he, Roles, and Shepherd would be the stockholders of the company, and Roles did not take exception. During this period, Roles was paying Corbet's expenses but Corbet did not receive any compensation for his efforts on behalf of the project. Corbet testified that

in late June 1991, Roles discontinued communications with him concerning the project.

The fact that Shepherd and Corbet continued to devote their efforts to the project after signing the disclaimers and without any form of compensation agreements supports their contention that they relied upon Roles' statements that the disclaimers had no effect upon their status as co-owners. Roles argues that because both Shepherd and Corbet favored obtaining the commitment of the Ethanol Authority to invest in the completed plant and were aware of the Ethanol Authority's requirement that Roles be the sole owner of Nebraska Nutrients as a condition for its commitment, Shepherd and Corbet could not have reasonably relied upon any verbal statements by Roles that the execution of the disclaimers would not affect their relationship as co-owners. In this regard, the district court made the following finding:

> The sudden substitution of Roles as the sole owner of the project, when financing barriers were encountered, corroborates the fact that these three parties, including Roles, where [sic] willing to engage in deception or half-truths about the actual ownership of the ethanol project. The fact that no one from the Ethanol Authority ever saw [the November 1, 1990, agreement and the disclaimers] firmly convinces me that the parties, again including Mr. Roles, were willing to present to the public that Roles was the sole owner of the project when that representation was expedient to obtain financing, but that the three individuals after February 25, 1991, continued to treat themselves as partners relying upon the November 1, 1990, agreement . . . .

Our de novo review of the record of the 1994 trial leads us to precisely the same conclusion.

Roles' contention in this litigation is that Shepherd and Corbet released any rights or interest in Nebraska Nutrients when they executed the disclaimers on February 25, 1991. We conclude on the basis of our de novo review that this position is directly contrary to the representation which Roles made to Shepherd and Corbet to induce them to execute the disclaimers and upon which they reasonably relied. If Roles' current position were upheld, Shepherd and Corbet would be damaged by

the loss of the time and effort they expended on the project both prior and subsequent to their execution of the disclaimers.

We note, as did the district court, that there is conflicting evidence on the issue of fraud which requires the finder of fact to assess and weigh the credibility of the parties. The district court made a specific finding that "a sufficient number of disinterested witnesses have come forward . . . at critical junctures to enable me to accept the testimony of Shepherd over Roles." Our standard of review requires that we give deference to this finding, inasmuch as the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

Based upon our de novo review of the record of the 1994 trial and the deference we must give to the trial judge on issues of credibility, we conclude that the district court did not err in determining that the disclaimers were procured through Roles' fraud and are therefore void.

### 3. EXISTENCE OF ENFORCEABLE CONTRACT

#### (a) Errors Assigned

In his second, fourth, and seventh assignments of error, Roles contends that the trial court erred in overruling his motions for directed verdict, judgment notwithstanding the verdict, and new trial, and in submitting the damage claims to the jury in the 1998 trial because there was no enforceable contract between Shepherd, Corbet, and himself.

#### (b) Standard of Review

Although these assignments of error pertain to motions made during the 1998 trial, the issue of whether the parties had an enforceable contract relates back to the trial court's finding following the 1994 trial that because the disclaimers executed by Shepherd and Corbet were induced by fraud and therefore void, the parties were bound by their November 1, 1990, agreement. We treat this as a factual finding made by the trial court in the exercise of its equity jurisdiction and review it de novo on the record, bearing in mind that where credible evidence is in conflict on a material issue of fact, the appellate court will consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts

rather than another. *Airport Auth. of Village of Greeley v. Dugan*, 259 Neb. 860, 612 N.W.2d 913 (2000); *Cao v. Nguyen*, 258 Neb. 1027, 607 N.W.2d 528 (2000).

### (c) Resolution

The core issue raised by these assignments of error is whether the agreement dated November 1, 1990, signed by Roles, Shepherd, and Corbet was initially or ever became an enforceable contract. Referring to the document in their original petition seeking declaratory relief, Roles and Nebraska Nutrients alleged:

> On November 1, 1990, Roles, Shepherd and Corbet entered into an agreement for the Project (the "Agreement"). Among other things, the Agreement provided that Roles, Shepherd and Corbet would each own one-third of all stock issued by [Nebraska Nutrients], with Shepherd's and Corbet's stock being indentured in certain respects.

Roles alleged that this agreement was subsequently altered by the execution of the disclaimers which he contends divested Shepherd and Corbet of any interest in Nebraska Nutrients so that he became the sole shareholder. The question of whether the November 1, 1990, agreement was itself enforceable was first raised by Roles, Nebraska Nutrients, and Tri-State in a proposed statement of issues filed before the 1994 trial and in their answer to an amended counterclaim filed by Shepherd.

We note that the November 1, 1990, document in question contains a provision that it shall be governed by the laws of the State of Arizona. With respect to the issue of whether the document is an enforceable contract, the parties have relied upon Nebraska case law in their briefs and Roles' counsel represented at oral argument that Nebraska and Arizona law were essentially the same on this point. We agree, and accordingly, we look to our precedent in resolving this assignment of error.

That precedent provides familiar and well-established rules governing the formation of a contract. To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. *Houghton v. Big Red Keno*, 254 Neb. 81, 574 N.W.2d 494 (1998); *Cimino v. FirsTier Bank*,

247 Neb. 797, 530 N.W.2d 606 (1995). An agreement to make a future contract is not binding upon either party unless all terms and conditions are agreed upon and nothing is left to future negotiation. *Cimino v. FirsTier Bank, supra.* A contract is not formed if the parties contemplate that something remains to be done to establish contractual arrangements or if elements are left for future arrangement. *Id.* An agreement to agree is not enforceable in Nebraska. *Id.* However, " 'a contract is not subject to the objection that it is indefinite so long as the parties can tell when it has been performed, and it is enough if, when that time arrives, there is in existence some standard by which performance can be tested.' " *Davco Realty Co. v. Picnic Foods, Inc.*, 198 Neb. 193, 198, 252 N.W.2d 142, 146 (1977), quoting 17 Am. Jur. 2d *Contracts* § 76 (1964). A binding mutual understanding or meeting of the minds sufficient to establish a contract requires no precise formality or express utterance from the parties themselves as to all the details of the proposed agreement; it may be implied from the parties' conduct and the surrounding circumstances. *Hoeft v. Five Points Bank*, 248 Neb. 772, 539 N.W.2d 637 (1995).

Roles' argument that the November 1, 1990, agreement did not constitute an enforceable contract focuses upon the language of paragraph 1, which states: "ROLES shall advance, as a loan to the venture, a mutually agreed upon sum of money and shall lend his business experience to the venture." Roles contends that this is merely an agreement to agree and that since the essential term regarding the amount of Roles' financial contribution to the project was left open for future agreement, no enforceable contract was formed. Shepherd and Corbet concede that the "mutually agreed upon sum of money" was a term to be agreed upon by the parties at a future time. However, they contend that such a future agreement occurred and caused the November 1 agreement to thereafter become an enforceable contract. Specifically, they contend that Roles' proposal on or about December 5, 1990, to fund the construction himself with a commitment for a contingent future investment by the Ethanol Authority became the mutually agreed upon sum referred to in the November 1 agreement. They argue that Roles agreed to fund the entire construction of the plant, at a time when the projected cost of doing

so was $12.5 million, thereby committing himself to a definite undertaking for which there was a meeting of the minds.

In conducting our de novo review of this issue, we first determine that the document executed by the parties on November 1, 1990, does not contemplate, as Roles characterizes it in his brief, a contract to loan money, but, rather, an agreement by the parties to define their interests in a joint venture. A joint venture arises from

> " 'an agreement to enter into an undertaking in the objects of which the parties have a community of interest and a common purpose in performance, and each of the parties must have equal voice in the manner of its performance and control of the agencies used therein, though one may entrust performance to the other.' "

*Evertson v. Cannon,* 226 Neb. 370, 390, 411 N.W.2d 612, 624 (1987), quoting *Fangmeyer v. Reinwald,* 200 Neb. 120, 263 N.W.2d 428 (1978). The primary criterion of a joint venture is that "the parties enter into an agreement, express or implied, as owners or principals in the endeavor." *Id.* From our review of the record, it is clear that Roles, Shepherd, and Corbet conceived and planned the construction of the Sutherland plant as principals in a business enterprise. The November 1 document contemplated that Roles would contribute initial funding and general business experience, that Shepherd would contribute his "expertise and ability to build and manage the plant," and that Corbet would contribute his efforts "to obtain a favorable climate for financing the facility and to market the finished product." For his efforts, each was to receive an equal share of stock of Nebraska Nutrients, the corporation which would own and operate the plant. The document provided that Roles' equity interest in the enterprise would continue after all sums advanced by him had been repaid from the net profits of Nebraska Nutrients. Thus, when the parties signed the November 1 document, Roles was not to be a disinterested lender, but, rather, a principal in a joint venture in which he, Shepherd, and Corbet were to each have a one-third equity interest.

The record reflects that as of November 1, 1990, the parties did not know how much money Roles would need to advance to the venture because they were still negotiating with the Ethanol

Authority for partial construction financing. A reasonable inference can be drawn that the parties anticipated that Roles would advance the difference between the construction financing received from the Ethanol Authority and the cost of completing the plant. When the Ethanol Authority determined that it was not willing to invest in the project until after the plant was completed and operational, Roles, by his own admission, proposed to fund "the rest of the construction if the [Ethanol] Authority would give a commitment to fund $6.125 million through the formation of a limited partnership upon completion of the ethanol plant project and receipt of an engineering report finding compliance with applicable standards of the industry." Roles made this proposal on December 4, 1990, and communicated it to Shepherd and Corbet on December 5. The commitment given by the Ethanol Authority to purchase a 49-percent interest in the completed plant for $6.125 million was conditioned upon allowable capital costs for the project totaling at least $12.5 million. Roles executed this document on behalf of Nebraska Nutrients and Tri-State.

In *T.V. Transmission v. City of Lincoln*, 220 Neb. 887, 891, 374 N.W.2d 49, 53 (1985), we cited the rule that

"[a]n agreement to make a future contract is not binding upon either party unless all terms and conditions are agreed upon and nothing is left to future negotiation. *When an agreement stipulates that certain terms shall be settled later by the parties, such terms do not become binding unless and until they are settled by later agreement.*"

(Emphasis supplied.) Quoting *Alward v. United Mineral Products Co.*, 197 Neb. 658, 250 N.W.2d 623 (1977). We concluded in *T.V. Transmission* that a contractual provision which permitted the parties to agree upon an adjustment of certain charges during the term of the contract did not create specific contractual rights. We stated that the modification provision constituted "nothing more than an agreement to agree in the future" and concluded that "[i]n the absence of such a future agreement, the provision is of no effect and is therefore unenforceable." 220 Neb. at 892, 374 N.W.2d at 53-54.

The language of *T.V. Transmission* suggests that an indefinite and therefore unenforceable "agreement to agree"

may become enforceable when the missing term is subsequently supplied by the parties. As a respected commentator notes, "[e]ven though the parties have expressed an agreement in terms so vague and indefinite as to be incapable of interpretation with a reasonable degree of certainty, they may cure this defect by later verbal clarification or their subsequent conduct that indicates their own practical interpretation." 1 Arthur L. Corbin, Corbin on Contracts § 4.7 at 606 (rev. ed. 1993). Although the November 1, 1990, agreement did not contain the essential term of the amount of funds which Roles would advance for the construction of the plant, that term was supplied by Roles' agreement approximately 35 days later to fund "the rest of the construction" if the Ethanol Authority would give its commitment to invest in the completed plant once it became operational. This promise by Roles defined with reasonable certainty the nature and extent of his obligation under the November 1 agreement so as to provide a standard by which his performance could subsequently be measured.

Thereafter, Roles advanced funds which were utilized to construct the plant for a period of approximately 2½ years, while Shepherd and Corbet performed the tasks and functions relating to the venture which were undertaken by them in the November 1, 1990, agreement, as discussed in detail above. In determining whether an agreement is sufficiently definite to be enforceable as a contract, "[t]he fact that one [party], with the knowledge and approval of the other, has begun performance is nearly always evidence that they regard the contract as consummated and intend to be bound thereby." Corbin, *supra*, § 4.1 at 542. See, also, Restatement (Second) of Contracts § 34(2) at 97 (1981) (providing "[p]art performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed").

Based upon our de novo review of the record, we conclude that the agreement signed by Roles, Shepherd, and Corbet on November 1, 1990, defining the terms of their joint venture became an enforceable contract when Roles subsequently agreed to fund the rest of the construction and the Ethanol Authority gave a commitment to invest in the completed plant if it proved to be operational. We have considered Roles' arguments that the

agreement was otherwise ambiguous and that it is unenforceable under the Arizona statute of frauds, Ariz. Rev. Stat. Ann. § 44-101(8) (West 1994), and find them to be without merit.

## 4. DAMAGES

### (a) Additional Factual Background

The testimony of certain witnesses during the 1998 trial is pertinent to Roles' assignments of error with respect to damages, and we therefore summarize that testimony here.

### (i) Dr. Stanley Watson

Dr. Stanley Watson, who has a doctorate in agronomy, testified that he had developed a short steep system for corn wet milling and had obtained a patent on the process in 1969. He viewed the Sutherland plant in November 1997 and observed that the equipment and short steep process at the plant were similar to that which he had designed. In his opinion, the short steep process at the Sutherland plant would work, but he acknowledged that the only way to determine this with absolute certainty would be to commence operation of the plant. On cross-examination, Watson admitted that the short steep process has never been used in a commercial operation. He acknowledged a statement in a pretrial deposition that the short steep process would be speculative on a commercial scale, but insisted that this meant only that one could not be absolutely certain that the process would work at the Sutherland plant without attempting operation.

### (ii) Dr. Raphael Katzen

Dr. Raphael Katzen, who holds a doctorate in chemical engineering, is a consulting engineer in the chemical industry. He has been involved in the design of approximately 20 grain-based ethanol plants, two of which were wet mill plants. Based upon his visit to the Sutherland plant on January 4 and 5, 1994, Katzen testified that the workmanship at the plant was in accord with industry standards. In his opinion, the plant was 90 to 95 percent complete in January 1994, and he questioned why the expenditure necessary to complete the plant was not made. Katzen specifically disagreed with a report written by Roles' expert, Boyd Ruppelt of PSI, Process Systems, Inc., which recommended various changes

to the plant in order to make it operational. It was Katzen's general opinion that the plant would operate as designed and built. On cross-examination, Katzen testified that he observed Occupational Safety and Health Administration compliance at the plant and assumed compliance with fire and building codes. He also stated that although the plant was designed to use a torula yeast reactor, he had never seen this device used as part of the wastewater treatment at a corn wet mill plant, although he opined that it would work as designed. Katzen further testified on cross-examination that it would cost between $1.7 and $2 million to convert the plant to a conventional steep wet mill, if necessary. He admitted it was possible the plant would not work in a commercially efficient manner. He acknowledged stating in his pretrial deposition that he would not recommend a short steep process without a more comprehensive pilot system.

### (iii) Michael Raasch

Michael Raasch is a certified general real estate appraiser licensed by the State of Nebraska since 1986. He has a degree in finance from the University of Nebraska. Raasch is certified to appraise commercial and residential properties.

Raasch testified that he had experience in the valuation of ethanol plants in Iowa and Nebraska, including the Chief Ethanol Plant, a dry mill ethanol plant in Hastings, Nebraska. Raasch performed an appraisal of the Sutherland plant as of December 18, 1997. He was asked on behalf of Shepherd and Corbet to value the plant on that date and to develop an annual net income for the years 1993 to 1997, based upon the assumptions that the plant was producing 15 million gallons of ethanol each of those years and that there was no debt on the plant. Raasch stated that ethanol plants typically operate at 110 to 115 percent of rated maximum capacity. Raasch testified that he used the income approach in valuing the plant. In doing so, he used historical data for the price of corn, gluten, germ, and ethanol for the years 1993 through 1997 and used the pro forma numbers to determine the price of brewers' and torula yeast during that time period. He testified that he used the pro forma price numbers because they were very close to the verbal information he was able to gather regarding the prices of the yeast products.

Due to the fact that the plant never became operational, he did not have information about the plant's actual operating expenses. To determine expenses, he relied upon the 10 years of appraisal experience he had with the Chief Ethanol Plant and his discussions with other plant owners to arrive at an average, which he testified was a "worse case scenario." Based on such information, he determined that the operating expenses for a dry mill were approximately 76 to 82 percent of gross sales. He further testified that although he did not receive information from any wet mill operators regarding expenses, trade publications indicated that wet mills are more expensive to run but have higher profit margins. He therefore determined that the Sutherland plant would have expenses between 80 and 85 percent of gross sales, based upon the fact that it was a wet mill and utilized some used equipment. Raasch opined that based upon these numbers and the income approach to valuation, the plant's value on December 18, 1997, had it been operating since 1993, would have been $30 million. Figures from the summary page of his report, which was admitted into evidence and submitted to the jury, revealed net income produced by the plant during the years 1993 to 1997 would have been at least $4 million per year.

On cross-examination, Raasch admitted that he was not permitted by the Chief Ethanol Plant to reveal the specifics of his appraisals done for that company, particularly its operating expenses. He stated that similar restrictions applied to any appraisal he did for ethanol plants. He further stated that because of such limitations, he was unable to divulge specific information that would allow a comparison of the Chief Ethanol Plant expenses with those anticipated by the Sutherland plant. He also stated that the plant, as it existed at the time of trial, was not worth $30 million because it was not finished. Raasch admitted that he relied upon the yields for each byproduct as listed on the pro forma projections prepared by Shepherd and that if any of those yield numbers were wrong, his final numbers would be affected.

### (iv) Fred Lockwood

Fred Lockwood, a certified public accountant, testified on behalf of Shepherd and Corbet. Lockwood was given yield num-

bers for the yeast byproducts that were to be produced by the plant and asked to project future revenues. His trial testimony, however, was limited to testimony regarding average yeast prices during the years 1994 to 1997. On cross-examination, Lockwood admitted that he obtained the price numbers he testified to simply by calling individuals suggested by his attorney. In particular, Lockwood telephoned Wright, of Coors Bio-Tech, to investigate the price of brewers' yeast from 1994 to 1997, and concluded the average price was 37 cents per pound. The price listed on the pro forma projections and used by Raasch in his appraisal was 20 cents per pound. He also telephoned the manager of quality assurance at Burns-Phillips Ingredients, one of two manufacturers of torula yeast in the United States, and concluded that the average price per pound of torula yeast during the years 1994 to 1997 was $1, an amount greater than that used by Raasch in his appraisal. On cross-examination, Lockwood insisted he relied upon the yield numbers in the pro forma projections in making his calculations. Additionally, Lockwood testified on cross-examination that the cost basis of the capital assets in the project was approximately $14 million. On redirect, he testified that in a subchapter S corporation, any deductions for loss should be taken by the owners in proportion to their ownership interest. He testified that in the tax returns he saw, Roles alone took all of the losses for the corporation, which amounted to approximately $6 million. On recross, he clarified that an individual with no tax basis cannot presently take a loss, but it can be carried over into the next tax year.

### (v) Boyd Ruppelt

Boyd Ruppelt, a senior project manager for PSI, Process Systems in Memphis, Tennessee, testified on behalf of Roles. Ruppelt testified that PSI, Process Systems specializes in processing corn into ethanol. In September 1997 and again in November 1997, he and a professional engineer viewed the Sutherland plant. After viewing the plant, he prepared a report detailing the work necessary to complete the plant and the cost of such work. Ruppelt's report found that significant work still needed to be done to complete the original scope of the plant, that Occupational Safety and Health Administration and

Environmental Protection Agency standards were not met, and that some of the equipment used at the plant was not properly installed and/or was not proper for the industry and needed to be replaced or changed. After detailing all of the specific wrongs he found at the plant, Ruppelt opined that $3.975 million in alterations were necessary before the plant could produce salable products and that another $1.74 million would be necessary if the short steep process did not work. On cross-examination, he admitted that in a 1993 report done for a potential buyer of the plant, his company recommended that the short steep process be tried. He also stated that he was not a licensed mechanical engineer and that at the time he viewed the plant, he could tell that some of the uncompleted tasks had been planned. He also testified that if the plant capacity was 18,000 bushels of corn per day and if it operated for 340 days per year, it would produce 17 million gallons of ethanol. He further admitted on cross-examination that the professional engineer who had accompanied him on his observation of the plant told him what items at the plant had not been done and that he was not completely familiar with all of the items. On redirect, he generally disagreed that a plant built as was the Sutherland plant could have a value of $30 million.

### (vi) Dr. Joseph Ruocco

Portions of Dr. Joseph Ruocco's deposition were read into evidence on behalf of Roles. Ruocco has a doctorate in microbiology and is a consultant for biological processes, primarily in wastewater treatment. Ruocco was previously employed by the Adolph Coors Brewing Company, where he worked for 2 years developing a system to grow torula yeast from waste beer. Torula yeast is commercially sold as an additive that makes the flavor in food stand out. Coors Brewing Company never commercially tested the yeast system he developed. Ruocco testified that he met with Roles, Shepherd, and Wright in the winter of 1989-90 and told them that torula yeast would be a suitable byproduct for an alcohol plant. He then had a series of approximately six other meetings to discuss the technical requirements of such a system with Shepherd. Ruocco testified that he understood the plant would produce 13 to 16 million gallons of ethanol per year. He testified that he told Shepherd it would be

several years before they would produce food-grade torula yeast. Ruocco testified that Shepherd thought the plant could initially produce animal-grade yeast and eventually produce a food-grade product. Ruocco viewed the plant in 1992 and had concerns about the design of the torula yeast system, but he did not voice his concerns at that time. He also testified that he thought the system was adequate to handle the plant's waste.

### (vii) Damage Instructions

On the issue of damages, the jury was instructed as follows:

If you find in favor of one or both of the defendants on his or their claim for breach of contract, then you must determine the proper amount of damages.

One who is injured by a breach of contract is entitled to recover all of his damages, including gains prevented as well as losses sustained, provided they are reasonably certain and such as might naturally be expected to follow the breach.

In arriving at the amount of the award, if any, you should include any damages suffered by the defendants because of lost profits; that is to say, profits which the defendants would have made, but for the unlawful conduct of plaintiff.

If you should find, from the greater weight of the evidence in this case, that damage to defendants' business or property, such as a loss in the profits, was proximately caused by the plaintiff's breach of contract complained of, then the circumstances that the precise amount of defendants' damages may be difficult to ascertain should not affect the defendants' recovery, particularly if the plaintiff's wrongdoings have caused the difficulty in determining the precise amount.

On the other hand, the defendants are not to be awarded purely speculative damages. An allowance for lost profits may be included in the damages awarded, only when there is some reasonable basis in the evidence in the case for determining that defendants have in fact suffered a loss of profits, even though the amount of such loss is difficult of ascertainment.

If you find in favor of one or both of the defendants, but do not find any actual damage, then you may award no more than a nominal sum.

Roles objected to the giving of this instruction.

### (b) Errors Assigned

In his third assignment of error, Roles contends that the district court erred as a matter of law in receiving in evidence, over his objection, "speculative financial data prepared by Richard Dodd and Shepherd and the testimony of Michael Raasch and Fred Lockwood as to damages."

In his fourth assignment of error, Roles contends that the district court erred as a matter of law "by instructing on the wrong measure of damages and in failing to find the evidence of damages in the 1998 jury trial insufficient to warrant submission of the case to the jury."

In his ninth assignment of error, Roles contends that the "amount of the jury's verdict for damages in the 1998 jury trial was clearly erroneous."

### (c) Standard of Review

A civil jury verdict will not be disturbed on appeal unless clearly wrong. *Streeks v. Diamond Hill Farms*, 258 Neb. 581, 605 N.W.2d 110 (2000).

A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Franksen v. Crossroads Joint Venture*, 257 Neb. 597, 599 N.W.2d 603 (1999).

The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Phipps v. Skyview Farms*, 259 Neb. 492, 610 N.W.2d 723 (2000); *Holden v. Wal-Mart Stores*, 259 Neb. 78, 608 N.W.2d 187 (2000).

### (d) Resolution

#### (i) Measure of Damages

Roles argues that the jury should have been instructed regarding the measure of damages in an action for failure to loan

money, as set forth in *Rubin v. Pioneer Fed. S. & L. Assn.*, 214 Neb. 364, 334 N.W.2d 424 (1983). However, as noted above, the November 1, 1990, agreement of the parties is not a contract to loan money, but, rather, is an agreement to enter into a joint business venture whereby Roles, Shepherd, and Corbet were to acquire an equity interest in Nebraska Nutrients, the corporate owner of the Sutherland plant. Thus, Roles' argument that the district court instructed on the wrong measure of damages is without merit.

### (ii) Qualifications of Raasch and Lockwood as Experts

Roles argues that Raasch and Lockwood "should not have been allowed to masquerade before the jury as 'experts' at all." Brief for appellant in case No. S-98-782 at 33. The requirements for admission of expert opinion testimony are found in Neb. Rev. Stat. § 27-702 (Reissue 1995). Section 27-702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Four factors govern the admissibility of expert testimony: (1) whether the witness is qualified as an expert, (2) whether the testimony is relevant, (3) whether the testimony will assist the trier of fact, and (4) whether the probative value of the testimony, even if relevant, is outweighed by the danger of unfair prejudice or other considerations. *Snyder v. EMCASCO Ins. Co.*, 259 Neb. 621, 611 N.W.2d 409 (2000); *Franksen v. Crossroads Joint Venture, supra.*

At trial, Roles did not challenge the qualifications of Raasch as a real estate appraiser or those of Lockwood as a certified public accountant. The record reflects that both were clearly qualified as experts in their fields. Raasch clearly possessed the knowledge, skill, experience, training, and education to express an expert opinion as to the value of an ethanol plant. He was a licensed and certified real estate appraiser with experience in the valuation of commercial property in general and ethanol plants in particular. Lockwood was a certified public accountant with experience in economic forecasting. Both were properly qualified as experts in their respective fields.

*(iii) Sufficiency of Evidence of Damages*

In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position the injured party would have occupied if the contract had been performed, that is, to make the injured party whole. *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000); *Phipps v. Skyview Farms, supra*. One injured by a breach of contract is entitled to recover all damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach. *Gagne v. Severa*, 259 Neb. 884, 612 N.W.2d 500 (2000); *Lone Cedar Ranches v. Jandebeur*, 246 Neb. 769, 523 N.W.2d 364 (1994).

The evidence which Shepherd and Corbet presented in support of their claim for damages consisted primarily of the opinion of Raasch that had it been completed, the Sutherland plant would have had a market value of $30 million as of December 18, 1997. In arriving at this opinion, Raasch utilized an income capitalization method which was based upon Raasch's projections of the plant's income, expenses, and net profits if it had been operating from September 1, 1993, through August 31, 1997. Roles argues that the trial court erred in receiving Raasch's opinions and those of Lockwood because they were based upon an inadequate factual foundation. Roles also contends that there was insufficient evidence of damages to warrant submission to the jury. As Roles notes in his brief, these contentions are "inextricably interwoven." Brief for appellant in case No. S-98-782 at 29.

We begin our analysis of these issues by reviewing the general rules applicable to opinion testimony by expert witnesses. Neb. Rev. Stat. § 27-703 (Reissue 1995) states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This court has stated that expert testimony should not be received if it appears that the witness is not in possession of such facts as will enable the expert to express a reasonably accurate

conclusion, and where the opinion is based on facts shown not to be true, the opinion lacks probative value. *Paulsen v. State*, 249 Neb. 112, 541 N.W.2d 636 (1996). The opinion must have a sufficient factual basis so that the opinion is not mere conjecture or guess. *Id.*

Our cases distinguish between the circumstance in which an expert's opinion on damages is based either upon a misconception of the applicable law or upon factual assumptions shown to be untrue or wholly unsupported by the record and the circumstance where there is a factual weakness in the underpinnings of an opinion. In the former, the opinion is inadmissible, whereas in the latter, the opinion is admissible and the factual weakness goes to the weight and credibility as determined by the trier of fact. For example, in *Sorensen v. Lower Niobrara Nat. Resources Dist.*, 221 Neb. 180, 376 N.W.2d 539 (1985) (superseded by statute on other grounds), we held that an appraiser's opinion with respect to damages in a condemnation case should not have been admitted because it was formulated on a misinterpretation of Nebraska law regarding a natural resource district's rights acquired in eminent domain and maximum exercise of such acquired rights. Similarly, in *Latek v. K Mart Corp.*, 224 Neb. 807, 401 N.W.2d 503 (1987), an economist's testimony concerning a plaintiff's decreased earning capacity was properly excluded because it was based upon an assumed permanent 10-percent disability and therefore in direct conflict with uncontroverted medical evidence that the disability was not permanent.

In contrast, in *Little v. Gillette*, 225 Neb. 70, 402 N.W.2d 852 (1987), two expert appraisers testified as to the value of a business, both basing their opinion in part upon expected duration of profits. Rejecting a contention that such opinions were speculative and not based upon facts in evidence, we noted that unlike the circumstance in *Latek v. K Mart Corp., supra,* the assumptions used by the experts were not proved untrue or to be without any basis in fact and that whether the stated grounds for the assumption were credible was a jury question. Similarly, in *Iske v. Metropolitan Utilities Dist.*, 183 Neb. 34, 157 N.W.2d 887 (1968), we rejected a contention that an expert's opinion regarding the value of real property was inadmissible because he had failed to consider various costs and expenses in his analysis. We noted:

> The essence of the defendant's complaint is that there were more and other costs reasonably attributable and that they were not taken into consideration as the defendant developed on cross-examination. The difficulty of this argument is almost apparent. It would require the upsetting of every case in which it could be developed that there were some of the multiple and various elements in the cost of developing a subdivision that were not taken into consideration by the expert witness. Our rule, and the sensible rule, is that such matters go to the weight and credibility of an expert's testimony and not to its admissibility.

*Id.* at 45, 157 N.W.2d at 895.

■ Roles' contention that the expert testimony on damages was speculative and therefore inadmissible rests upon two basic arguments: (1) There was an insufficient factual basis to assume that the Sutherland plant would ever have become operational at all because it utilized unproven "short steep" technology which had never been employed on a commercial scale and (2) Raasch's profit projections were based upon faulty assumptions with respect to production quantities, income, and expenses. Both of these arguments pertain to the fact that the Sutherland plant was a new business which was never completed and operational. We have noted that

> although in many . . . instances lost profits from a new business are too speculative and conjectural to permit recovery of damages, "where the evidence is available to furnish a reasonable certain factual basis for computation of probable losses, recovery of lost profits cannot be denied, even though a new business venture is involved."

*El Fredo Pizza, Inc. v. Roto-Flex Oven Co.,* 199 Neb. 697, 706, 261 N.W.2d 358, 364 (1978), quoting *Earle M. Jorgensen Co. v. Tesmer Manufacturing Co.,* 10 Ariz. App. 445, 459 P.2d 533 (1969). Because Arizona and Nebraska law agree on this key principle, we utilize Nebraska case law in our analysis, as did the parties in their briefs. We therefore examine whether the record contains an adequate factual basis to provide foundation for Raasch's expert opinion that the Sutherland plant, if completed in 1993, would have been operational and profitable.

## a. If Completed, Would Sutherland Plant Have Operated as Designed?

There was undisputed evidence at trial that the short steep and torula yeast reactor technology which the Sutherland plant was designed to utilize had not previously been employed in the commercial production of ethanol and related byproducts. It is also true, however, that there was no evidence categorically establishing that the technology would not work. Watson, who developed and holds a patent on the short steep process, testified that it is a variation of the general wet milling process which is utilized to produce ethanol from corn. Based upon his knowledge of the process and his inspection of the partially completed Sutherland plant in November 1997, Watson expressed his opinion that the plant would operate as designed, utilizing the short steep process. Katzen, a consulting engineer with experience in the construction of ethanol plants, testified that in his opinion, the Sutherland plant, including its short steep components, was constructed in accordance with industry standards and that the torula yeast reactor incorporated in the design would work.

The record also contains evidence that Roles was aware that the plant would utilize the novel technology but was nevertheless confident it would operate as designed. In late 1990, when the Ethanol Authority questioned whether the short steep technology would work, Roles observed the operation of a pilot plant constructed by Shepherd and expressed satisfaction that the process would work. At that point, Roles had invested less than $1 million in the project. When the Ethanol Authority decided that it would not fund the construction of the plant, in part because of its continuing concern about the untested technology, Roles proposed to fund the entire cost of construction himself if the Ethanol Authority would agree to invest in the completed plant upon receipt of evidence that it would operate as designed. Thereafter, Roles invested more than $12 million in the project before discontinuing the funding in 1993, prior to completion of the plant. When Roles attempted to sell the uncompleted plant to an interested party in late 1993 and early 1994 for a price exceeding $18 million, he produced data reflecting the plant's anticipated production and expressed no reservations about its ability to function as designed.

We conclude that this evidence formed a sufficient basis for Raasch's assumption that if completed, the plant would have functioned as designed. We acknowledge that there is other evidence in the record which could lead to a contrary inference. However, such evidence goes to the weight and credibility of the expert opinion which is to be determined by the jury.

### b. If Completed, Would Sutherland Plant Have Operated at Profit?

Roles argues that Raasch's projections regarding the profitability of the Sutherland plant were speculative and lacked foundation, and therefore should have been excluded. He relies upon *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996), a professional negligence action brought by a retailer against its former accountants alleging that because of negligently performed audits, the retailer lost profits and market value. The retailer sought to prove its loss of profits through an expert witness who compared the company's profits during the time period in question to a subsequent period when the effects of the alleged malpractice had been corrected. This court concluded that because the expert failed to take into consideration substantial differences in the operations of the company during the two periods, including number of stores and differences in markets, products, and management, the profit projections were speculative and conjectural as a matter of law and that the issues of lost profits and decreased value of the business therefore should not have been submitted to the jury.

*World Radio Labs. v. Coopers & Lybrand, supra,* involved an attempt to quantify the damage to an existing business caused by a third-party tort-feasor. The relationship of the parties and the nature of the claim in the present case are substantially different. Roles, Shepherd, and Corbet entered into a new business venture with the obvious objective of making a profit. They began with certain shared plans and expectations which did not come to fruition, allegedly because of a breach of their agreement by Roles. As noted above, the measure of damages in an action for breach of contract includes the gains prevented as well as the losses sustained by the breach. Therefore, a logical starting

point in this analysis is the reasonable expectation of the parties prior to the breach.

In arriving at his projections regarding the profitability of the plant if it had been completed, Raasch utilized the pro forma financial and product yield projections for the plant developed by Shepherd and Dodd. He supplemented these by determining and using actual historical price data, where available, for corn to be purchased by the plant and for the ethanol and byproducts which it would have produced. Although Roles testified at trial that he did not claim that Shepherd did anything wrong in developing the pro forma projections, in his brief, Roles challenges them as the product of a " 'by guess and by golly' " methodology. Brief for appellant in case No. S-98-782 at 30. This argument ignores the fact that the pro forma projections were included in the application for funding which Nebraska Nutrients submitted to the Ethanol Authority with the knowledge and approval of Shepherd, Corbet, *and Roles*. In the final report of its due diligence review, the Ethanol Authority's evaluation team reported that "[t]he pro formas submitted by the applicant and reviewed by the Evaluation Team (with the assistance of the accounting consultant) indicate the project meets the profitability test." The report also notes that Nebraska Nutrients had "identified markets for the production and made realistic price assumptions." It concluded that Nebraska Nutrients had demonstrated a "reasonable possibility" that the Ethanol Authority would be able to recoup its anticipated investment in the Sutherland plant. Given these facts, it was reasonable and permissible for Raasch to utilize the pro forma projections in arriving at his opinion of the anticipated profitability of the Sutherland plant if it had been funded to completion.

Roles also contends that Raasch's opinion with respect to anticipated operating expenses of the plant was speculative and flawed. In this portion of Raasch's analysis, he utilized his knowledge of the operating expenses incurred by other Nebraska ethanol plants for which he had done appraisals, as well as information he obtained from other ethanol plant owners. Based upon a 10-year average of operating expenses as a percentage of gross sales, he arrived at a range of 76 to 82 percent. Using a "worse case" approach, he calculated projected

profits at both an 80-percent and an 85-percent expense factor and based his opinion of value on the lower resulting profit projection.

Roles argues that Raasch's expense assumptions used in arriving at his profit projections were flawed because he failed to consider items such as payment of debt, taxes, sales commissions, and management inexperience or startup problems. While recognizing the principle that an expert's opinion must have a sound and reasonable basis such that an expert is able to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture, we have stated that an appellate court is not a superexpert and will not lay down categorically which factors and principles an expert may or may not consider. Such matters go to the weight and credibility of the opinion itself and not to its admissibility. *Lange v. Crouse Cartage Co.*, 253 Neb. 718, 572 N.W.2d 351 (1998); *Holman v. Papio-Missouri River Nat. Resources Dist.*, 246 Neb. 787, 523 N.W.2d 510 (1994). Based upon our review of this record, we conclude that there was an adequate factual basis upon which Raasch could opine, based upon his experience and training, that if completed in 1993, the Sutherland plant would have operated at a profit for the next 4 years. Accordingly, the district court did not abuse its discretion in overruling Roles' foundational objection and permitting Raasch to express his opinion with respect to lost profits and value. The weaknesses in the factual underpinnings of Raasch's opinion go to its weight and credibility, not its admissibility.

Uncertainty as to the fact of whether damages were sustained at all is fatal to recovery, but uncertainty as to amount is not if the evidence furnishes a reasonably certain factual basis for computation of the probable loss. *Sack Bros. v. Tri-Valley Co-op*, 260 Neb. 312, 616 N.W.2d 786 (2000); *Lone Cedar Ranches v. Jandebeur*, 246 Neb. 769, 523 N.W.2d 364 (1994). The testimony of Raasch and other evidence in this record, if believed by the trier of fact, would support a reasonable inference that if it had been funded to completion, the Sutherland plant would have had market value and operated at a profit as Roles, Shepherd, and Corbet originally intended. It is undisputed that Shepherd and Corbet have not realized any share in such profits or value pursuant to the operative November 1,

1990, agreement. Therefore, it is clear that Shepherd and Corbet sustained damage as a result of what they alleged to be Roles' breach of the agreement in discontinuing funding for construction, in that they were deprived of the gain which would have inured to them from the successful completion and operation of the plant. For the reasons discussed, we conclude that the record contains a reasonably certain factual basis for computing the amount of damages, and the district court therefore did not err in submitting the issue to the jury.

## 5. JURY INSTRUCTIONS

### (a) Error Assigned

In his sixth assignment of error, Roles contends that in the 1998 trial, the district court erred in (1) informing the jury, in a pretrial instruction and in instruction No. 8 given at the close of trial, of its findings from the 1994 bench trial, including the finding of fraud; (2) giving instruction No. 17 pertaining to damages; and (3) refusing to give his proposed instructions Nos. 2 and 3 pertaining to contracts to loan money.

### (b) Standard of Review

Whether a jury instruction given by a trial court is correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court. *Pleiss v. Barnes*, 260 Neb. 770, 619 N.W.2d 825 (2000).

In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Smith v. Paoli Popcorn Co.*, 260 Neb. 460, 618 N.W.2d 452 (2000).

To establish reversible error from a court's failure to give a requested instruction, an appellant has the burden of showing that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the tendered instruction. *Pleiss v. Barnes, supra*; *Streeks v. Diamond Hill Farms*, 258 Neb. 581, 605 N.W.2d 110 (2000).

## (c) Resolution

### (i) Instructions Regarding 1994 Findings

The trial was bifurcated on Roles, Nebraska Nutrients, and Tri-State's motion, in which they contended that the counterclaims involved a substantial amount of expert discovery and testimony which were not germane to the issues raised in their petition. Prior to the 1998 jury trial, and after discussion with counsel at a status conference, the court entered an order, setting forth those findings of fact which it had made following the 1994 trial as well as specific issues which would be submitted to the jury for determination following the 1998 trial. Following entry of this order, Roles filed a motion in limine seeking to exclude all references to the court's findings of fraud following the 1994 trial. In overruling this motion, the district court specifically stated that it would instruct the jury at the commencement of trial that it was bound to accept the findings which the court had made following the 1994 trial, including the findings that Roles had induced Shepherd and Corbet to execute the disclaimers based upon fraudulent representations. Roles did not object when the court gave this preliminary instruction. Roles subsequently offered the disclaimers as evidence during the 1998 trial.

When a motion in limine to exclude evidence is overruled, the movant must object when the particular evidence which was sought to be excluded by the motion is offered during trial in order to preserve error for appeal. *Allphin v. Ward*, 253 Neb. 302, 570 N.W.2d 360 (1997). Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error. *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 605 N.W.2d 136 (2000). Because Roles had notice that the court intended to give a preliminary instruction regarding its previous findings and did not object at the time the instruction was given, he has not preserved any alleged error with respect to the giving of the preliminary instruction.

The trial court's 1994 findings were also included in a "Statement of the Case" instruction, designated instruction No. 8, given at the close of the evidence. Roles objected generally to

the giving of this instruction and made specific objections to certain portions of the instruction, but not to that portion which set forth the court's previous findings. Assuming without deciding that this objection preserved the error which Roles argues on appeal, the record does not establish that the inclusion of the 1994 findings in instruction No. 8 was prejudicial. The same instruction specifically informed the jury that it could not award any damages by virtue of the fraudulent misrepresentations by Roles. In addition, the jury was instructed that the trial judge was not permitted to comment on the evidence and that if it appeared that he had so commented during either the trial or the giving of the instructions, the apparent comment should be disregarded. The jury was also instructed not to interpret the judge's statements or rulings as an opinion as to how the case should be decided. We therefore conclude that there was no reversible error in giving instruction No. 8.

### (ii) Instructions Pertaining to Damages

Roles argues that the trial court erred in refusing to give his proposed instructions Nos. 2 and 3, which generally defined the elements of a contract to loan money. As previously noted, the 1990 agreement of the parties was not a contract to loan money, but, rather, was an agreement defining the terms of a joint business venture involving Roles, Shepherd, and Corbet. The district court did not err in refusing to give the instructions proposed by Roles because the tendered instructions were not warranted by the evidence.

Roles also argues that the giving of instructions Nos. 8 and 17 with respect to damages was error on several grounds. Roles argues that the two instructions, read in conjunction, improperly permitted the jury to award lost profits in the event that it determined that Roles breached the parties' agreement by utilizing the tax benefits of Nebraska Nutrients and Tri-State for the tax years after 1990. We disagree. Instruction No. 17 provides that "[o]ne who is injured by a breach of contract is entitled to recover all of his damages, including gains prevented as well as losses sustained, provided they are reasonably certain *and such as might naturally be expected to follow the breach*." (Emphasis supplied.) Instruction No. 17 also instructs that damages must

be "proximately caused by the . . . breach of contract complained of." Proximate cause is defined in instruction No. 11. Therefore, because the instructions clearly provided that the jury award only those damages proximately caused by the breach complained of, they were not prejudicially erroneous in this regard.

Roles also argues that instruction No. 8 is inconsistent. The instruction initially informs the jury that it is not to determine if Roles is a creditor in the bankruptcy action involving Nebraska Nutrients. However, it then goes on to provide as a possible breach of contract by Roles that he took Nebraska Nutrients and Tri-State into bankruptcy in Arizona. A close examination of the evidence and the instruction, however, resolves any facial inconsistency. The evidence at trial revealed that Roles filed a number of claims in the bankruptcy action which have yet to be examined by the bankruptcy judge. Instruction No. 8 simply informed the jury that it need not decide the validity of Roles' bankruptcy claims, while not precluding them from considering the fact that he was a petitioning creditor in the bankruptcy action in determining the breach claims. It is an instruction's meaning, not its phraseology, that is the crucial consideration, and a claim of prejudice will not lie when the instruction's meaning is reasonably clear. *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 605 N.W.2d 136 (2000). In addition, Roles does not allege how any inconsistency in these instructions prejudiced him. It is the burden of the complaining party to establish that judicial prejudice has occurred. *Everts v. Hardcopf-Bickley*, 257 Neb. 151, 595 N.W.2d 911 (1999); *Bunnell v. Burlington Northern RR. Co.*, 247 Neb. 743, 530 N.W.2d 230 (1995).

Roles also argues that instructions Nos. 8 and 17 are incorrect because they allow the jury to find that Roles breached the contract by attempting to terminate Shepherd and Corbet's interest in the plant and the corporations. He contends that this instruction allows the jury to award to Shepherd and Corbet damages for Roles' actions in seeking to have the disclaimers enforced. Roles argues that the instructions therefore allow Shepherd and Corbet to both rescind the disclaimers and recover damages on the disclaimers, violating the election of remedies doctrine.

There was evidence at trial indicating that Roles and Shepherd discussed eliminating Corbet from participating in the project in 1991 and that Roles barred Shepherd and Corbet from the premises in 1993. In addition, there was evidence that Roles held corporate meetings to elect himself as the officer and director of both corporations and to terminate Shepherd as an employee. From the record, it appears that there was sufficient evidence at trial, wholly unrelated to the disclaimer issue, regarding Roles' efforts to terminate the interests of Shepherd and Corbet in the project. Furthermore, the jury was specifically instructed that it was not to award any damages by virtue of any fraudulent misrepresentation performed by Roles in obtaining the disclaimers. Therefore, because the evidence supports this instruction and because the jury instructions, taken as a whole, indicate that the instruction was correct and not prejudicial, there is no reversible error.

### 6. MOTIONS FOR DIRECTED VERDICT, NEW TRIAL, AND JUDGMENT NOTWITHSTANDING THE VERDICT

#### (a) Additional Background

During the 1998 trial, Roles moved for a directed verdict after Shepherd and Roles had rested and after all parties had rested. Both motions were overruled. Following the jury verdict, Roles filed a motion seeking a new trial or, alternatively, judgment notwithstanding the verdict, asserting 50 separate grounds and supported in part by an affidavit from a juror, K.R. In the affidavit, K.R. averred that the jurors discussed the evidence prior to deliberations, and in particular, she accused another juror, B.F., of stating after opening arguments that B.F. did not need 2 weeks to decide the case because B.F. knew Roles was a " 'slime' " and had let the community down by not finishing the plant.

The court held an evidentiary hearing on the allegations of juror misconduct, at which hearing each individual juror was questioned. K.R. testified regarding the allegations in her affidavit and stated that they were all true. She said she was upset because she thought the jury talked too much and that on one occasion, she talked to the bailiff about her concerns, and the bailiff told her what was going on was wrong. K.R. also testified that she realized after she was selected for the jury that her

brother had worked at the Sutherland plant. K.R. specifically testified that she never had any problem with the verdict.

B.F. testified that she did not make any of the statements which had been attributed to her by K.R. prior to deliberations. B.F. admitted that her son had worked at the plant for Shepherd and that she was aware of that fact before deliberations, but denied discussing the case with her son. B.F. testified that she felt sorry for K.R. because K.R. had difficulty understanding the trial issues and looked to B.F. for explanation. B.F. testified that on one occasion, the bailiff told the jurors they needed to be quiet because someone had overheard them laughing.

None of the other jurors remembered B.F.'s making the comments attributed to her by K.R., and no other juror shared K.R.'s concern that improper discussions were had prior to deliberations. All of the jurors testified that the bailiff did on one occasion tell them to quiet down because they were laughing. Some of the jurors testified that they saw a young man in the hallway after the first day of deliberations whom they later found out was a reporter but that none of the jurors spoke to the reporter or had any other contact with him.

The district court's bailiff testified that this had been her first trial in that capacity. About one-third of the way through the trial, she talked to the jury because the court reporter heard them laughing in the hallway and thought she heard them mention a topic of that day's testimony. The bailiff further testified that during the trial, K.R. approached her and said she thought the jurors had made up their minds. According to the bailiff, K.R. did not give her reasons for reaching this conclusion. The bailiff did not tell the judge about her conversation with K.R. She testified, however, that she spent considerable time going in and out of the jury room prior to deliberations and that she did not hear the jury talking about the trial. The bailiff was also present when the reporter wandered into the jury room after deliberations on the first day and inquired if there had been a verdict. She informed the reporter there was no verdict and told him to leave, and he apologized and left.

Based upon its review of the evidence, the district court determined that the allegations of juror misconduct made by K.R.

were untrue and denied Roles' motion seeking a new trial or judgment notwithstanding the verdict.

### (b) Error Assigned

In his seventh assignment of error, Roles contends that the district court erred as a matter of law, following the 1998 trial, in overruling his motions for directed verdict, new trial, and judgment notwithstanding the verdict for reasons including, but not limited to, alleged juror misconduct.

### (c) Standard of Review

■ A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *Smith v. Paoli Popcorn Co.*, 260 Neb. 460, 618 N.W.2d 452 (2000); *Gestring v. Mary Lanning Memorial Hosp.*, 259 Neb. 905, 613 N.W.2d 440 (2000).

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Genetti v. Caterpillar, Inc., ante* p. 98, 621 N.W.2d 529 (2001); *O'Connor v. Kaufman*, 260 Neb. 219, 616 N.W.2d 301 (2000).

■ On a motion for judgment non obstante veredicto, or notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *McLain v. Ortmeier*, 259 Neb. 750, 612 N.W.2d 217 (2000).

■ In order to sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Id.*

■ The trial court's ruling on a question involving jury misconduct will not be disturbed on appeal absent an abuse of discretion. *Smith v. Papio-Missouri River NRD*, 254 Neb. 405, 576 N.W.2d 797 (1998).

### (d) Resolution

Based upon the allegations set forth in the affidavit of K.R., the district court properly conducted an evidentiary hearing pursuant to the rule that

> when an allegation of jury misconduct is made and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent that the defendant was denied a fair trial. If the trial court determines that the misconduct did not occur or that it was not prejudicial, adequate findings are to be made so that the determination may be reviewed.

*State v. Arnold*, 253 Neb. 789, 796, 572 N.W.2d 74, 80 (1998); *Hunt v. Methodist Hosp.*, 240 Neb. 838, 485 N.W.2d 737 (1992).

In order for a new trial to be granted due to juror misconduct, the party claiming the misconduct has the burden to show by clear and convincing evidence that prejudice has occurred. *Hartley v. Guthmann*, 248 Neb. 131, 532 N.W.2d 331 (1995). We conclude that the trial court did not abuse its discretion in determining that Roles did not meet this burden. While it is true that both K.R. and the bailiff testified that K.R. did indeed voice her concerns during the trial about improper jury deliberations, every other juror denied discussing the case prior to submission. Because this evidence is decidedly in conflict, we cannot say the district court abused its discretion in reaching its determination that there was no juror misconduct.

For this reason, as well as for the reasons articulated in our discussion of Roles' other assignments of error, we conclude that the district court did not err in overruling Roles' motions for a directed verdict, new trial, or judgment notwithstanding the verdict.

### 7. ATTORNEY FEES

#### (a) Additional Background

Prior to the 1998 trial, the district court ruled that Arizona law would control the proceedings because of the choice-of-law provision in the November 1, 1990, agreement. In response to

Roles' pretrial motion to strike the claim for attorney fees, the court specifically stated that the statutes of Arizona allowed the court to award attorney fees to the successful party in a contract action. Although it refused to submit a claim for punitive damages under Arizona law, the district court reasoned that the "public policy of the State of Nebraska with reference to attorneys fees does not rival the express public policy of this State so far as the same pertains to punitive damages." At the conclusion of the trial, the court calculated the attorney fees to be awarded by determining that $100 was a reasonable hourly fee in Lincoln County during 1993 to 1998. It then determined that a multiplier of 2.0 should be applied to the rate to compensate the attorneys for taking the risk of a contingency fee and then multiplied the number of hours each attorney worked on the case in order to determine the amount of fees awarded. Total attorney fees and expenses awarded exceeded $1.3 million.

(b) Error Assigned

In his eighth assignment of error, Roles contends that the district court erred as a matter of law in awarding attorney fees to counsel for Shepherd and Corbet.

(c) Standard of Review

Whether the law of Nebraska or that of another state controls the disposition of an issue by a Nebraska court is an issue of law, for which an appellate court is obligated to reach a conclusion independent of that reached by the trial court. See *Powell v. American Charter Fed. Sav. & Loan Assn.*, 245 Neb. 551, 514 N.W.2d 326 (1994).

(d) Resolution

Our analysis of this issue begins with two provisions of the November 1, 1990, agreement between Roles, Shepherd, and Corbet. Paragraph 16 of the agreement provides: "In the event it becomes necessary for any party hereto to employ counsel to enforce any of the terms or provisions of the Agreement, then the non-prevailing party shall pay to the prevailing party all reasonable attorney's fees incurred in connection therewith." Paragraph 18 of the agreement provides that it "shall be governed by the laws of the State of Arizona."

In a pretrial order, the district court denied Roles' motion to strike the claims for attorney fees, reasoning that Arizona law was applicable and that "the statutes of the State of Arizona clearly allow the Court if the Defendants are successful in a contract action to award attorneys fees." At the time of the court's order, the applicable Arizona statute provided in relevant part: "In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees. This section shall in no manner be construed as altering, prohibiting or restricting present or future contracts or statutes that may provide for attorney's fees." Ariz. Rev. Stat. Ann. § 12-341.01 (West 1992). Notably, however, Arizona case law holds that the statute is not applicable if it conflicts with an express contractual provision governing the recovery of attorney fees. *Jordan v. Burgbacher*, 180 Ariz. 221, 883 P.2d 458 (Ariz. App. 1994); *Sweis v. Chatwin*, 120 Ariz. 249, 585 P.2d 269 (Ariz. App. 1978). The court of appeals in *Sweis* reasoned:

> If § 12-341.01 were to be held applicable to this litigation, it would in effect cancel the unqualified contractual right to recover attorney's fees given to the successful party by their agreement, and substitute in its place the purely discretionary or permissive right given by the statute. This would clearly be an alteration of the agreement of the parties . . . .

*Sweis v. Chatwin*, 120 Ariz. at 252, 585 P.2d at 272. Assuming that the contract provision for attorney fees would be enforceable under Arizona law, the dispositive question in this case is whether a Nebraska court must apply Arizona law in resolving this issue.

Although substantive rights of parties to an action are governed by the state where the cause of action arose, procedural matters are dictated by the law of the forum. *Whitten v. Whitten*, 250 Neb. 210, 548 N.W.2d 338 (1996). We must initially determine, therefore, whether a claim for recovery of attorney fees in the action in which they were incurred is a substantive or procedural matter. Under Nebraska law, attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *In re*

*Application of SID No. 384*, 259 Neb. 351, 609 N.W.2d 679 (2000). See *Zimmerman v. FirsTier Bank*, 255 Neb. 410, 585 N.W.2d 445 (1998). There is no Nebraska statute authorizing the award of attorney fees in an action on a contract, and no uniform course of procedure has been followed in this regard. However, this court has addressed the choice-of-law issue presented in this case and refused to award attorney fees under similar circumstances, reasoning that the recovery of attorney fees is procedural in nature and therefore governed by the law of the forum. In *Security Co. v. Eyer*, 36 Neb. 507, 54 N.W. 838 (1893), a mortgage contained a provision providing that if an action was brought to foreclose it, the plaintiff was entitled to an attorney fee. This court held that such stipulations are invalid and will not be enforced by a Nebraska court. The plaintiff in that case had argued that the mortgage contained a clause providing that it was to be construed by the laws of the State of Iowa, under which an award of attorney fees was authorized when contracted for by the parties. Even assuming that to be so, we held:

> But it by no means follows, because the clause in the note and mortgage in regard to attorneys' fees is valid in Iowa, that the stipulation can be enforced in this state. Attorneys' fees, in states where they are allowed by the court to the successful party, are in the nature of costs, and are taxed and treated as such. They are no part of the judgment proper. . . .
>
> In general, costs are recoverable only by force of some statutory provisions, and the law of the place of the forum in respect to costs is applied. The law in force at the place the contract is made does not govern costs.

(Citations omitted.) *Id.* at 513, 54 N.W. at 840. We thus concluded that the clause in the mortgage relating to attorney fees was invalid.

Similar facts were presented and a similar rationale applied in *Hallam v. Telleren*, 55 Neb. 255, 75 N.W. 560 (1898). In *Hallam*, a note provided " 'should suit be commenced to enforce the collection of this note a reasonable sum shall be allowed as attorneys' fees and taxed with the costs on the cause.' " 55 Neb. at 257, 75 N.W. at 560. Although the evidence demonstrated that the notes were made and payable in Iowa and that the provision

for payment of attorney fees was valid and enforceable in that state, we cited *Eyer* and held: "But such a provision is a stipulation for costs and refers to the remedy. It is not a substantive part of the contract itself and cannot be enforced in another jurisdiction." *Id.* at 257, 75 N.W. at 561.

While more than a century old, the holdings of *Security Co. v. Eyer, supra,* and *Hallam v. Telleren, supra,* that attorney fees are elements of court costs and therefore affect only a remedy have never been abrogated. Indeed, we have followed this principle in other contexts. See, e.g., *Brodersen v. Traders Ins. Co.,* 246 Neb. 688, 523 N.W.2d 24 (1994) (finding attorney fees are costs, not damages); *Smith v. Fremont Contract Carriers,* 218 Neb. 652, 358 N.W.2d 211 (1984) (holding statutory amendment allowing recovery of attorney fees in workers' compensation cases was procedural in nature); *Nye-Schneider-Fowler Co. v. Bridges, Hoye & Co.,* 98 Neb. 863, 155 N.W. 235 (1915) (holding attorney fees are costs and relate only to remedy). Because Nebraska law deems the recovery of attorney fees in the action in which they are incurred to be a procedural issue governed by the law of the forum, the district court erred in applying the substantive law of Arizona in awarding attorney fees to Shepherd and Corbet. We therefore vacate the award of attorney fees and expenses.

## IV. CONCLUSION

The appeal docketed as case No. S-95-624 is dismissed because it was not perfected from a final, appealable order. With respect to the appeal docketed as case No. S-98-782, for the reasons stated in this opinion, we reverse and vacate that portion of the judgment of the district court requiring Roles to pay attorney fees and expenses to Shepherd and Corbet in the total amount of $1,395,754.34. In all other respects, the judgment is affirmed.

APPEAL IN NO. S-95-624 DISMISSED.

JUDGMENT IN NO. S-98-782 AFFIRMED IN PART, AND IN PART REVERSED AND VACATED.

WRIGHT, J., not participating.